IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION


DARLENE GENESE LEE              )
                                )
v.                              )        No. 1:06-0076
                                )
MICHAEL J. ASTRUE[1]            )
        Commissioner of Social Security    )



To:  The Honorable Thomas A. Wiseman, Jr., Senior District Judge



REPORT AND RECOMMENDATION

        The plaintiff filed this action pursuant to 42 U.S.C. § 405 (g) to obtain judicial review of the

final decision of the Commissioner of the Social Security Administration denying the plaintiff's

application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"),

as provided by the Social Security Act.

        The plaintiff filed applications for DIB and SSI on December 6, 2004, alleging disability as

of December 2, 2004.[2] (Tr. 81-84, 433-37.) The plaintiff alleged that she suffered from degenerative

_____

        [1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as
Commissioner of Social Security pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

        [2] The plaintiff previously filed a SSI application on April 25, 2001, and a DIB application
on June 8, 2000, with an alleged onset date of October 21, 1999. (Tr. 47.) ALJ Mack Cherry
dismissed the plaintiff's claims on June 27, 2003, when the plaintiff failed to appear at a scheduled
hearing. (Tr. 19, 39-40.) The plaintiff submitted "good cause" for not appearing at the scheduled
hearing, her claim was reopened, and a hearing held on December 8, 2003. (Tr. 19.) On May 10,
2004, ALJ Cherry issued an unfavorable decision, finding that the plaintiff was able to perform a

-1-

disc disease and major depressive disorder. (Tr. 81-84, 127-29.) The plaintiff's claim was denied initially and upon reconsideration. (Tr. 17, 437-44.) A hearing was held before an Administrative Law Judge ("ALJ") on March 16, 2006 (Tr. 17, 445-77), and an unfavorable decision issued on April 20, 2006. (Tr. 17-26.) The Appeals Council denied the plaintiff's request for review on July 28, 2006 (Tr. 7-9), and the ALJ's decision became the final decision of the Commissioner.

# I. BACKGROUND

The plaintiff was born on July 29, 1961, was 44 years old at the time of the hearing, and 43 years old on December 2, 2004, the alleged onset date. (Tr. 81, 447.) The plaintiff has a high school diploma. (Tr. 450.) In 1985, the plaintiff began working on an airbag assembly line where she lifted between 75 and 80 pounds. (Tr. 451.) The plaintiff has also been employed as a certified nurse technician, a fast food worker, and a sewing machine operator. (Tr. 101, 450-51, 468-70.)

## A. Chronological Background: Procedural and Medical Records

### 1. Historical medical information

Prior to the alleged onset date, the plaintiff sustained several injuries on the job as well as in motor vehicle accidents that involved the plaintiff's upper extremities, back, neck, left hip, and right leg. (Tr. 20, 329-403.) On March 31, 1992, the plaintiff suffered an on-the-job lower back injury. (Tr. 388.) Beginning in April of 1992, Dr. Gregory B. Langford referred the plaintiff for

---

"light level of work." (Tr. 50.) The plaintiff's request for review was denied by the Appeals Council on July 1, 2004. (Tr. 19.) The plaintiff did not seek judicial review of that decision.

Case 1:06-cv-00076   Document 24   Filed 02/20/09   Page 2 of 30 PageID #: 89

physical therapy.[3] *Id.* Over the course of several examinations in 1992 and 1993, Dr. Langford diagnosed the plaintiff with lumbar strain, lumbar degenerative disc disease, lumbar radiculopathy, and cervical radiculopathy. (Tr. 382-88.) The plaintiff declined surgery, and Dr. Langford concluded on July 1, 1993, that the plaintiff reached "maximum medical improvement." (Tr. 382.) Dr. Langford opined that the plaintiff could lift 10 pounds frequently, and not more than 20 pounds occasionally. (Tr. 382.)

On July 12, 1996, the plaintiff was involved in an automobile accident and complained of persistent neck and shoulder pain. (Tr. 379.) Dr. Daniel Eslick examined the plaintiff on August 5, 1996, determined that she suffered from "strain and contusion," and allowed her to return to work the following day. (Tr. 379.) However, on August 6, 1996, the plaintiff was not able to return to work and presented to Dr. Kenneth L. Moore with complaints of pain. (Tr. 378.) An August 1996 MRI "failed to reveal any significant operable pathology," and on August 28, 1996, Dr. Moore released the plaintiff to work with no repetitive bending for a month.[4] (Tr. 372.)

While working on an assembly line on May 19, 1999, the plaintiff injured her left hip and buttock region. (Tr. 366.) Dr. Angelo DiFelice diagnosed the plaintiff with sacroiliac inflamation ("SI") and referred her to Dr. Christopher Ashley. (Tr. 366.) Dr. Ashley was the plaintiff's treating physician from November 16, 1999, until July 30, 2001.[5] (Tr. 334-64.) At the plaintiff's initial visit, Dr. Ashley opined that the plaintiff suffered from "post lumbar strain and hip contusions" that was

---

[3] Dr. Langford noted that the plaintiff did not show up for multiple appointments and had not followed the prescribed physical therapy regimen. (Tr. 386-88.)

[4] In his August 28, 1996, report Dr. Moore noted that the plaintiff missed "all of her therapy" and "went back yesterday [August 27, 1996] to do her therapy." (Tr. 372.)

[5] It appears that Drs. Langford, Eslick, Moore. DiFelice, and Ashley are all physicians with the Middle Tennessee Bone and Joint Clinic.

-3-

likely related to "SI joint dysfunction." (Tr. 364.)  Dr. Ashley ordered a MRI of the plaintiff's left hip and lumbar spine, and he noted his plan for the plaintiff to undergo physical therapy.[6] (Tr. 363.) The plaintiff returned to Dr. Ashley on December 2, 1999, without having attended a single physical therapy session. *Id.*  The plaintiff continued to complain about pain in the lower left side of her back and in her legs, although Dr. Ashley reported that MRIs of the plaintiff's pelvis and hips were "unremarkable." (Tr. 361, 363.)  He again ordered physical therapy for the plaintiff. (Tr. 363.)

Although by January 4, 2000, the plaintiff had gone to physical therapy seven times, the pain in the plaintiff's left buttocks, hip, and leg persisted. (Tr. 361.) Dr. Ashley opined that the plaintiff's pain was the result of a SI joint problem. *Id.*  The February 3, 2000, MRI of her lumbar spine revealed a "degenerated disc with a disc bulge at L5-S1" and Dr. Ashley opined that this was "an old degenerative problem." (Tr. 358-59.)   Dr. Ashley scheduled the plaintiff for a "left SI joint injection with fluoroscopy" and recommended that the plaintiff continue physical therapy.[7] (Tr. 359.) Dr. Ashley also noted that the plaintiff could return to light duty work and should not lift more than 50 pounds and 25 pounds occasionally. (Tr. 355.)

The plaintiff returned to Dr. Ashley on March 13, 2000, and reported that the SI joint injection did help with her pain. *Id.*  Dr. Ashley noted that although the plaintiff will have some "persistent intermittent low back pain," he found no reason for any permanent restrictions and he determined "within a degree of medical certainty it would be medically probable that [the plaintiff]

---

[6] In his November 16, 1999, treatment notes, Dr. Ashley referred to reports of the plaintiff's physical therapist indicating that the plaintiff had not given "her full effort." (Tr. 364.)

[7] Physical therapist Bill Mastalerz noted in his February 2, 2000, report that the plaintiff had attended "17 out of 25 sessions since 12/6/99." (Tr. 356.)

-4-

would not have any increased injury by working . . . ."[8] (Tr. 351.)  The plaintiff did not return to Dr. Ashley again until December 1, 2000.  At that time, the plaintiff's condition remained unchanged and Dr. Ashley prescribed a second SI joint injection and placed the plaintiff back on Vioxx. (Tr. 346.)

After the second SI joint injection on January 15, 2001, the plaintiff reported no improvement in the amount of her pain. (Tr. 342.)  The plaintiff had been working since November of 2000, and Dr. Ashley opined that she could continue working without any restrictions. *Id.*  The plaintiff returned to Dr. Ashley on May 11, 2001, and reported that she had not been working because of increased pain in her buttocks, back, and pelvis. (Tr. 341.)  Dr. Ashley again opined that the plaintiff's pain appeared to emanate from the SI joint and he ordered an MRI of the plaintiff's pelvis "to rule out any significant lesion" that could possibly be contributing to the plaintiff's pain. (Tr. 341.)  During a final follow-up visit on July 30, 2001, Dr. Ashley explained to the plaintiff that the results of the MRI revealed that her pelvis was normal. (Tr. 336.)  Dr. Ashley acknowledged that while the plaintiff's lower back pain would continue, her back was "structurally sound" and he found no "structural reasons that would necessitate permanent restrictions." *Id.*

### 2. Medical treatment information after alleged onset date

The plaintiff was admitted to the Middle Tennessee Mental Health Institute ("MTMHI") on December 2, 2004, and released on December 6, 2004. (Tr. 155.)  At intake, Dr. M.S. Jahan examined the plaintiff and diagnosed her with major depressive disorder that was severe and

---

[8] On March 13, 2000, Mr. Mastalerz reported that the plaintiff had attended only two out of her last fifteen therapy sessions. (Tr. 350.)

Case 1:06-cv-00076   Document 24   Filed 02/20/09   Page 5 of 30 PageID #: 92

recurrent, but without psychotic features; pain disorder; constant pain on left side of the body; and

a Global Assessment of Functioning ("GAF") between 31-39.[9] (Tr. 161.) Five days later,

Dr. Jahan's discharge summary noted that the plaintiff was in "obvious distress because of her pain

due to her excessive medical illness," had difficulty working, made good eye contact, and had a

logical and coherent thought process. (Tr. 157.) Dr. Jahan also determined that the plaintiff did not

have "suicidal or homicidal ideation,"[10] her memory was intact, and her insight and judgment were

fair. *Id.* Dr. Jahan's physical examination of the plaintiff "revealed chronic neck, back, and hip

pain." *Id.* The discharge summary also indicated that the plaintiff's depression, appetite, and sleep

were all improved and that the plaintiff was not suicidal at the time of release. *Id.* The plaintiff was

diagnosed with a GAF of 55-60.[11] (Tr. 155.)

After being discharged from MTMHI, the plaintiff began outpatient treatment at Centerstone

Community Mental Health Center ("Centerstone") from December 13, 2004, to September 17, 2005.

(Tr. 22, 205-328.) Centerstone's Clinically Related Group ("CRG") intake assessment of the

plaintiff determined that she was "not able to perform ADL's [activities of daily living] due to

depression and anxiety," was isolated from others, did not have the ability to concentrate beyond

---

[9] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. A GAF of 31-40 falls within the range of "[s]ome impairment in reality testing or communication [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR").

[10] The discharge summary noted that the plaintiff was "depressed and suicidal" when she was admitted. (Tr. 157.)

[11] A GAF of 55-60 falls within the range of "[m]oderate symptoms [or] moderate difficulty in social occupational, or school functioning." DSM-IV-TR at 34.

-6-

her problems, and could not adjust to change. (Tr. 209-10.)  Centerstone diagnosed the plaintiff's GAF at intake to be 40.[12] (Tr. 211.)

The plaintiff presented to Dr. William J. Van Veen on January 10, 2005, and told him that she remained unemployed because of her mental and physical health. (Tr. 254.)  Dr. Van Veen prescribed Cymbalta for the plaintiff. (Tr. 207.)  Treatment notes from the plaintiff's March 8, 2005, appointment indicate that the plaintiff was "angry at peers" and "angry and hostile over [her] disability claim."[13] (Tr. 247.)  The plaintiff returned to Cornerstone on March 9, 2005, and the treatment notes reflected that the plaintiff was not "being medication compliant and not even filling the original prescription from Dr. Van Veen," and thus the plaintiff was "not progressing with her emotional/behavioral goal." (Tr. 246.)  Since the plaintiff's intake assessment on December 13, 2004, she had missed or canceled seven different appointments with Centerstone. (Tr. 242-44, 250-52, 257.)  On May 4, 2005, Centerstone conducted a second CRG assessment to update the plaintiff's progress and noted that the plaintiff had difficulty cleaning her home and  remembering appointments; limited social support from family members and staff; problems concentrating, remembering tasks, and required prompting; and trouble adjusting to sudden changes or conflicts. (Tr. 285-86.)  The CRG diagnosis concluded that the plaintiff was a person with severe and persistent mental illness and that the duration of this illness totaled six months or longer. (Tr. 287.)  Following the CRG assessment, Centerstone case manager Amy Coughlin met with the plaintiff for an unscheduled visit on May 9, 2005, and the plaintiff admitted that she had not taken her prescribed

_____

[12] *See supra* note 9.

[13] Karen Edwards completed the progress notes.  The record does not reflect that Dr. Van Veen participated in any treatment at Centerstone after January 10, 2005.

medication in four months. (Tr. 239.) The plaintiff did not show for her next two appointments. (Tr. 236-37.)

Centerstone case manager Kimberly Hart visited the plaintiff on May 17, 2005 (Tr. 234), and reported that she was medication compliant and that her psychological status had improved.[14] *Id.* Ms. Hart met with the plaintiff again on June 16, 2005, and opined that the plaintiff's psychological status was not improved.[15] (Tr. 231.) Ms. Hart also encouraged the plaintiff to keep her scheduled physical therapy appointments. (Tr. 232.) The plaintiff did not show for her next three Centerstone appointments. (Tr. 228-30.) On July 5, 2005, Hart re-evaluated the plaintiff, finding the plaintiff's overall psychological status had improved from her previous visit.[16] (Tr. 226.) The plaintiff was still medication compliant, but demonstrated poor memory. *Id.* Centerstone progress notes indicated that the plaintiff missed her next three appointments and that she needed a refill of Cymbalta. (Tr. 224.)

The plaintiff presented to Centerstone Nurse Tonya Feron on July 22, 2005, after she had not been examined by a doctor "for some time."[17] (Tr. 220.) Nurse Feron noted that the plaintiff's status was unchanged from the previous visit and she recommended that the plaintiff continue taking the prescribed medication, including Cymbalta. (Tr. 220-21.) On August 5, 2005, Dr. Ralph Barr examined the plaintiff in the Centerstone "noncompliance clinic" because she had numerous missed

_____

[14] Ms. Hart used four different psychosocial assessments to determine the plaintiff's current status: activities of daily living, interpersonal functioning, adaptation to change, and concentration. (Tr. 234.) She listed the plaintiff's status as fair in three of the four categories. *Id.*

[15] Ms. Hart indicated that the plaintiff's condition was "poor" in three of the four psychosocial assessment categories. (Tr. 231.)

[16] Ms. Hart raised the plaintiff's psychological status to "fair" for two of the four psychosocial stressors. (Tr. 226.)

[17] The plaintiff was last examined by Dr. Van Veen on January 10, 2005. (Tr. 224.)

appointments. (Tr. 215.)  At this examination, the plaintiff complained of having "anxiety, worry, and depression." *Id.*  In his medical progress notes, Dr. Barr indicated that the plaintiff appeared anxious but maintained appropriate affect and behavior and exhibited a normal thought process. (Tr. 216-17.)  Dr. Barr increased the plaintiff's dosage of Cymbalta to 60 milligrams. (Tr. 219.) After Dr. Barr's examination of the plaintiff, Ms. Hart evaluated the plaintiff's mental status. (Tr. 213.)  Ms. Hart determined that the plaintiff's appearance and behavior were appropriate, mood/affect was anxious, speech was organized, thought process normal, thought content was "[w]ithin normal limits," and that her insight, judgment, and motivation for treatment were all fair. *Id.*

The plaintiff also received treatment from physicians not associated with Centerstone. Dr. Lisa Weaver treated the plaintiff from April 14, 2003, through August 31, 2005. (Tr. 21, 411, 416-17, 420-22, 426-27.)  Dr. Weaver diagnosed the plaintiff with back pain, depression, a heart murmur, and atypical chest pain. (Tr. 21, 416-17.)  On August 31, 2005, a MRI revealed that the plaintiff's "disc at L5-S1 is degenerated [with] a diffuse disc bulge" and that "a prominent posterior osteophyte" results in "mild bilateral neural foraminal narrowing," but otherwise the plaintiff's discs were normal. (Tr. 420.)  However, in December of 2005, Dr. Weaver was "unable to assess" the plaintiff's ability to do work related physical activities. (Tr. 412.)

On March 30, 2005, Dr. Darrel Rinehart performed a consultative examination on the plaintiff. (Tr. 190-92.)  Dr. Rinehart found that the plaintiff's range of motion ("ROM") in the joints of her hands, wrists, elbows, shoulders, cervical spine, feet, ankles, knees, and hips was normal. (Tr. 191.)  He noted that the plaintiff walked with a normal station and gait, could balance on either foot,  had lumbosacral flexion limited by pain, and was able to squat halfway. *Id.*  The plaintiff's

Case 1:06-cv-00076   Document 24   Filed 02/20/09   Page 9 of 30 PageID #: 96

muscle strength in her lower extremities was mildly diminished but normal in her upper extremities. *Id.* Dr. Rinehart concluded that the plaintiff had no evidence of muscle atrophy and that she could sit, stand, or lift 20 pounds intermittently for four to six hours in an eight hour work day. (Tr. 192.)

On October 18, 2005, Dr. Douglas Wilburn examined the plaintiff on referral by Vocational Rehabilitation.[18] (Tr. 22, 322-34.) The plaintiff described her difficultly with eating, the discomfort in her neck and shoulder, and lumbosacral pain. (Tr. 333.) Dr. Wilburn's examination revealed that the plaintiff was alert and oriented, walked slowly and with a limp, could only bend forward 20 to 30 degrees, had five degrees of extension, complained of pain in her lumbosacral junction, and had no radicular hip pain. (Tr. 332.) Dr. Wilburn concluded that the plaintiff did not give sufficient effort during testing although she claimed that any type of motor testing caused pain in her left hip area. *Id.* Dr. Wilburn diagnosed the plaintiff with chronic neck pain, chronic back and left hip pain, a degenerative L5-S1 disc, and myofascial strain of the lumbosacral spine and left SI joint. *Id.*

Dr. Wilburn opined that due to the plaintiff's chronic pain syndrome, the plaintiff should be put on a "30 lb. lifting restriction without any repetitive lifting, bending, or twisting."[19] *Id.* Dr. Wilburn further noted that the plaintiff would likely be relegated to a sedentary job, but that she could stand or walk intermittently. *Id.* After his examination, Dr. Wilburn completed a physical capacity worksheet in which he limited the plaintiff to sitting for six hours and standing or walking for three hours in an eight hour workday. (Tr. 330.) Dr. Wilburn also opined that the plaintiff should not squat or crawl, but that she could occasionally bend, stoop, or reach. *Id.*

---

[18] It appears that Dr. Wilburn is also a physician with the Middle Tennessee Bone and Joint Clinic, where Drs. Langford, Eslick, DiFelice, and Ashley practiced.

[19] Dr. Wilburn acknowledged that the plaintiff seemed more concerned with being labeled disabled than with finding a job that she could perform. (Tr. 332.)

-10-

### 3. Residual functional capacity assessments

On March 7, 2005, George T. Davis, Ph.D., of the Tennessee Disability Determination Services ("DDS") completed a Psychiatric Review Technique Form ("PRTF"). (Tr. 172-85.) Under sections 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders) of the PRTF, Dr. Davis diagnosed the plaintiff with major depressive disorder and panic disorder. (Tr. 175, 177.) Dr. Davis then rated the degree of limitations for these two listings, finding that the plaintiff had only mild restriction in her ADLs; moderate difficulty in maintaining social functioning, concentration, persistence, or pace; and had suffered one or two episodes of decompensation. (Tr. 182.) Dr. Davis concluded that the plaintiff's depression and panic disorders moderately limited her functioning. (Tr. 184.)

Dr. Davis also compiled a mental Residual Functional Capacity ("RFC") Assessment of the plaintiff in which he determined that the plaintiff was "Not Significantly Limited" in sixteen of twenty categories. (Tr. 186-87.) Dr. Davis found the plaintiff to be "Moderately Limited" in her ability to "maintain attention and concentration for extended periods, complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," to interact appropriately with the general public, and to respond appropriately to changes in the work setting. (Tr. 187.) Given these limitations, Dr. Davis concluded that the plaintiff could understand and remember simple and detailed tasks; concentrate and focus on the same tasks, despite some difficulty; interact with coworkers and supervisors without significant limitations; interact with coworkers, supervisors and the general public "despite some difficulty" but "without substantial limitation;" and "adapt to work-life settings and changes with some, but not substantial difficulty." (Tr. 189.)

On June 30, 2005, Dr. Celia Gulbenk, a DDS physician, completed a physical RFC assessment of the plaintiff. (Tr. 194-95.) Dr. Gulbenk opined that the plaintiff could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand or walk six hours in an eight hour workday, sit for a total six hours in an eight hour work day, and perform an unlimited amount of pushing or pulling with hand or foot controls. (Tr. 194.) Furthermore, Dr. Gulbenk determined that the plaintiff did not have any postural, manipulative, visual, communicative, or environmental limitations. (Tr. 195-97.)

Dr. Gulbenk also reviewed treating and examining source statements that differed from her findings. Dr. Gulbenk opined that the plaintiff's claims of back pain were not convincing since there was no medical evidence of record to document this condition, the plaintiff did not seek treatment for her lower back pain, and there was no prescribed pain medication. (Tr. 200.) Additionally, Dr. Gulbenk noted that physical examinations showed that the plaintiff had a normal gait and a full range of motion in all joints. *Id.* Dr. Gulbenk did not find medical evidence to explain the plaintiff's complaints of pain in her body's "entire left side." *Id.* Although an X-ray of the plaintiff indicated degenerative disc disease with some sclerotic changes in L5-S1, demonstrating a severe back impairment, Dr. Gulbenk ultimately concluded that the plaintiff's claims of pain "were not wholly credible." *Id.*

### B. March 16, 2006, Hearing: Testimony of the Plaintiff and the Vocational Expert

The plaintiff testified that beginning in 1985, she worked on an assembly line and had to frequently lift 75 to 80 pounds. (Tr. 451.) While working on the assembly line the plaintiff suffered a ruptured disc in 1992 and in 1999 a "tow motor" struck the left side of her body. (Tr. 452.) The

-12-

plaintiff related that she had excruciating neck pain after her 1992 injury and tendinitis in her hands since 1994. (Tr. 453.)  The plaintiff also testified that she could not lift her right arm over her shoulder, had difficulty writing with her right hand because tendinitis numbs her entire arm, and had excruciating shoulder pain. (Tr. 454.)  The plaintiff claimed that her right hand becomes fatigued when she uses it to comb her hair, brush her teeth, or cook, and that she does not use her left hand.[20] (Tr. 455.)

The plaintiff testified that if she stood for any length of time her back and left hip pain "from [her] ankles to [her] knee would turn into a brick." (Tr. 456.)  The plaintiff also reported that after her injury in 1999, her hip pops; she is able to walk for three to five minutes and stand for five to ten minutes; when sitting her tailbone, hip, and legs all become numb; and she can lift only "a gallon" with her right hand. (Tr. 456-58.)

The plaintiff then addressed her major depressive disorder, stating that she feels unloved, unable to complete tasks that her practitioners assign or to get along with people, and that most people are against her. (Tr. 459, 461.)  The plaintiff acknowledged that she had missed medical and "budgeting appointments," but she explained that her absences were due to scheduling conflicts, lack of transportation, and her difficulty in concentrating.  (Tr. 460, 467.)  The plaintiff also testified that she has "random" suicidal thoughts, a fluctuating appetite, weight loss of 50 pounds, and has difficulty sleeping and getting up in the morning.[21] (Tr. 462, 464.)  The plaintiff described her

_____

[20] The plaintiff testified that she does not comb her hair, brush her teeth, or cook. (Tr. 454.) However, the plaintiff subsequently acknowledged that she combs her hair once a week and brushes her teeth every two or three days. (Tr. 455.)

[21] The plaintiff explained that it takes her 45 minutes to fall asleep and that she wakes up every two to three hours. (Tr. 463.)  Additionally, the plaintiff stated that she occasionally has to sit and wait for one to two hours for the numbness in her leg to dissipate or for her back to feel normal.

-13-

normal day as beginning with making herself comfortable, followed by preparing a sandwich, and then occasionally cleaning her home. (Tr. 466.)

The plaintiff testified that after working on the assembly line at an air conditioning business, she worked as a prepper at McDonald's and at Krystal's in 2001 and 2002. (Tr. 469.) The plaintiff also related that in 2003 and 2004 she worked weekends at HQM, a nursing home, as a certified nurse technician. (Tr. 469-70.)

The vocational expert ("VE"), Jane Brenton, testified that the plaintiff's past work as a certified nurse's technician would be classified as medium and semi-skilled; the assembler position, according to the Directory of Occupational Titles ("DOT"), typically would be considered medium and unskilled but, considering the plaintiff's testimony, the VE classified it as heavy; and the sewing machine operator and fast food worker positions would both be designated light and unskilled. (Tr. 471.) In response to a hypothetical, the VE opined that a person with the plaintiff's characteristics, including the ability to lift between 10 to 30 pounds occasionally; sit for six hours, stand for three hours, and walk for three hours; occasionally bend, but never squat or crawl; occasionally stoop; occasionally reach above shoulder level; with no allergies or difficulty with transportation; and ability to drive would allow her to perform her past relevant light work. However, the VE explained that a GAF of below 50 would render that individual unable to work. (Tr. 474.)

The ALJ next asked the VE if there were any sedentary unskilled jobs, not involving significant interaction with the public or co-workers, that a high school graduate could perform. (Tr. 475.) The VE responded that the following jobs fit the ALJ's criteria: inspectors, approximately

---

(Tr. 464.)

7,000 in Tennessee and 250,000 in the United States; order checkers, approximately 1,200 in Tennessee and 74,000 in the United States; and sorters, approximately 14,000 in Tennessee and 497,000 in the United States. *Id.* On cross-examination, the plaintiff's attorney referenced the May 4, 2005, CRG assessment, which determined that the plaintiff needed significant help cleaning her home; attending appointments; adjusting to change; addressing conflicts; and had a GAF ranging from 35 to 42, and asked the VE what type of individual that CRG assessment described. (Tr. 475-76.) The VE answered, "One not capable of work." *Id.*

## II. ALJ'S FINDINGS

Based on the record, the ALJ made the following findings in his April 20, 2006, decision.

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2009.

2. The claimant has not engaged in substantial gainful activity at any time since the alleged onset date of disability, December 2, 2004 (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).

3. The claimant has the following severe impairments: degenerative disc disease and a major depressive disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

   * * * *

5. The claimant has the residual functional capacity to lift and/or carry 25 pounds frequently and 50 pounds occasionally; sit for a total of about 6 hours in an 8 hour workday; stand and/or walk for a total of about 6 hours in an 8 hour workday; frequently climb, balance, kneel, crouch, crawl, stoop, push, pull, or reach. The claimant can understand and remember simple and detailed tasks; can concentrate and attend to the same tasks despite some difficulty; can interact with coworkers and supervisors without significant limitations; can interact with the general public

-15-

despite some difficulty; and can adapt to work-like settings and changes with some, but not substantial, difficulty.

6.     The claimant is capable of performing past relevant work as a sewing machine operator and fast foot [sic] worker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.     The claimant has not been under a "disability," as defined in the Social Security Act, from December 2, 2004, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 20, 25-26.)


# III. DISCUSSION

## A. Standard of review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the

-16-

case de novo, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Heston*, 245 F.3d at 534 (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. 20 C.F.R. § 416.920(a)(4)(I).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Heston*, 245 F.3d at 534 (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." § 404.1521(b). The Commissioner is required to consider the

-17-

combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C.§ 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Foster*, 853 F.2d at 490 (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id*. The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a prima facie case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a prima facie case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can

-18-

perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner to carry his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled.[22] *Id. See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

**B. The five step inquiry**

In this case, the ALJ resolved the plaintiff's case at step four of the five-step inquiry, and ultimately concluded that the plaintiff was not under a disability as defined by the Act. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since December 2, 2004, the alleged onset date of disability. (Tr. 20.) At step two, the ALJ found that the plaintiff's degenerative disc disease and a major depressive disorder were severe impairments. *Id.* At step

---

[22] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if he or she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

-19-

three, the ALJ determined that the plaintiff's impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. *Id.* At step four, the ALJ found that the plaintiff was capable of performing past relevant work as a sewing machine operator or fast food worker. (Tr. 25.)

The effect of this decision was to preclude the plaintiff from DIB and SSI benefits and to find her not disabled, as defined in the Social Security Act, at any time after December 2, 2004, through the date of the decision.

### C. Plaintiff's assertions of error

The plaintiff alleges that the ALJ erred in evaluating her mental impairments, failed to give adequate weight to the assessments of her treating psychiatrists, Dr. M.S. Jahan and Dr. William J. Van Veen, and failed to follow the requirements of Social Security Ruling 00-4p by not addressing the consistency of the VE's testimony with the Dictionary of Occupational Titles ("DOT").

### 1. The ALJ properly assessed the plaintiff's mental RFC in accordance with 20 C.F.R. §§ 404.1520a and 416.920a.

The plaintiff asserts that the ALJ erred in failing to evaluate properly the plaintiff's mental RFC as required by 20 C.F.R. §§ 404.1520a, 404.1527, 416.920a, and 416.927. (Docket Entry No. 17, at 8.) Specifically, the plaintiff contends that while the ALJ did set forth exact ratings regarding the plaintiff's degrees of limitation in each of the functional areas listed in subsection (c) of 20 C.F.R. §§ 404.1520a and 416.920a, the ALJ failed to specify which functional limitations, contained in the record, he considered in compiling those ratings. *Id.* at 9.

-20-

When assessing a plaintiff's mental RFC, the ALJ's written decision must include findings based upon a "special technique." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). The special technique is a series of steps delineated in subsections (b) through (e) of 20 C.F.R. §§ 404.1520a and 416.920a. First, the ALJ is required to evaluate the plaintiff's "pertinent symptoms, signs, and laboratory findings to determine whether [the plaintiff has] a medically determinable mental impairment(s)."[23] 20 C.F.R. §§ 404.1520a(b)(1) and 416.920a(b)(1). Next, the ALJ must assess the plaintiff's degree of functional limitation caused by the mental impairment. 20 C.F.R. §§ 404.1520a(b)(2) and 416.920a(b)(2). The regulations acknowledge the individualized nature of this step by requiring the ALJ "to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the plaintiff's] overall degree of functional limitation." 20 C.F.R. §§ 404.1520a(c)(1) and 416.920a(c)(1). Thus, the ALJ must "consider all relevant and available clinical signs and laboratory findings, the effects of [the plaintiff's] symptoms, and how [the plaintiff's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." *Id.*

After considering all the available relevant evidence, the ALJ must rate the plaintiff's functional limitation in the four following functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.[24] 20 C.F.R.

---

[23] If the ALJ determines that the plaintiff has a medically determinable mental impairment, the ALJ must provide detailed support for such findings in accordance with 20 C.F.R. §§ 404.1520a(e) and 416.920a(e).

[24] Decompensation is the "failure of defense mechanisms resulting in progressive personality disintegration." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 437 (27th ed. 1988).

-21-

§§ 404.1520a(c)(3) and 416.920a(c)(3).[25]  These four functional limitations are known as the "B"

criteria.[26]  The regulations then require the ALJ to determine the severity of the plaintiff's mental

impairment by comparing the degrees of the plaintiff's limitations in the four broad functional areas

to the listed mental disorders. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2).

The ALJ is also required to follow 20 C.F.R. §§ 404.1520a(e) and 416.920a(e) in

documenting the application of the special technique.  The ALJ's written decision must include the

germane findings and conclusions based on the special technique; show the plaintiff's significant

history, such as medical examinations and laboratory findings, and the functional limitations

considered in determining the severity of the plaintiff's mental impairments; and provide a specific

finding regarding the level of the plaintiff's limitation in each of the four functional areas listed in

20 C.F.R. §§ 404.1520a(c)(3) and 416.920a(c)(3).   20 C.F.R. §§ 404.1520a(e)(2) and

416.920a(e)(2).

Contrary to the plaintiff's assertion, the ALJ complied with  20 C.F.R. §§ 404.1520a and

416.920a.  First, the ALJ provided a specific degree of limitation for each of the four functional

limitations listed in 20 C.F.R. §§ 404.1520a(c)(3) and 416.920a(c)(3).  The ALJ explained,

> In applying the "B" criteria for mental impairments, the claimant has a mild
> restriction in the activities of daily living; a moderate limitation in maintaining social
> functioning; a moderate limitation in maintaining concentration, persistence, and
> pace; and there have been one or two episodes of decompensation.  Since the

---

[25] The regulations require the ALJ to attach a point value to each of the four functional areas.
20 C.F.R. §§ 404.1520a(c)(4) and 416.920a(c)(4).  For the first three categories, the regulations set
forth a five-point assessment scale: none, mild, moderate, marked, and extreme. *Id.*  The fourth
category, episodes of decompensation, is rated with a four point scale: none, one or two, three, four
or more. *Id.*

[26] The term "B criteria" corresponds to the paragraph "B" criteria of the expansive list of
mental disorders in  20 C.F.R. Pt. 404, Subpt. P, App. 1.

-22-

claimant does not have a marked limitation in at least two of these functions or repeated episodes of decompensation, the "B" criteria are not met . . . .[27]

(Tr. 20.) The ALJ discussed both the plaintiff's hospitalization at MTMHI in December 2004 and the plaintiff's ten month outpatient treatment at Centerstone. (Tr.21-22.) The ALJ appropriately considered the plaintiff's lack of medical compliance, failure to follow prescribed treatment, and repeated missed appointments. (Tr. 24.) The ALJ noted that the plaintiff's passive approach toward treatment inhibited her ability to make any improvements behaviorally or emotionally. *Id.* When the plaintiff stopped taking her medication, her symptoms increased, but when the plaintiff resumed taking her medications in May 2005, she felt better.[28] (Tr. 24.)

Social Security regulations require a claimant to follow her physician's prescribed treatment if such treatment is able to restore the claimant's ability to work. 20 C.F.R. §§ 404.1530(a) and 416.930(a). If the claimant does not follow the prescribed treatment and is not able to provide good reasons for failing to follow the prescribed treatment, then the claimant will not be found to be disabled. 20 C.F.R. §§ 404.1530(b) and 416.930(b). Since the record indicates that the plaintiff's prescribed treatment controlled and improved the plaintiff's symptoms, the plaintiff's unwillingness

---

[27] The ALJ adopted the March 7, 2005, opinion of Dr. George T. Davis, a psychologist with the DDS. (Tr. 172-89.) *See supra* at 10-11.

[28] The ALJ noted:
> The record does not show that there are any side effects from prescribed medication that caused significant limitations of function that lasted for a period of 12 continuous months. Rather, the evidence demonstrates that the [plaintiff] received a good result from medications when taken as prescribed on a consistent basis. Complaints of sleepiness were addressed by the recommendation that the claimant take the medication at night.

(Tr. 24.)

-23-

to follow the prescribed treatment and to keep appointments supports the ALJ's decision that the plaintiff was not disabled based upon mental limitations. (Tr. 24, 157, 168, 220, 224, 226, 231, 234, 307, 310, 312.)

The ALJ did not err in failing to comply with 20 C.F.R. §§ 404.1520a and 416.920a. After applying the "B" criteria and giving specific ratings for each of the four functional limitation categories, the ALJ supported his findings with substantial evidence from the record. (Tr. 20, 24.)

The plaintiff also contends that the ALJ failed to give proper consideration to the plaintiff's GAF scores. On December 2, 2004, MTMHI diagnosed the plaintiff with a GAF of 31-39 during an initial psychiatric assessment. (Tr. 161.) After five days of treatment, MTMHI discharged the plaintiff with a GAF of 55-60. (Tr. 155.) During the plaintiff's nine month outpatient treatment at Centerstone, her GAF fluctuated between 30 and 42. (Tr. 211, 287.) The plaintiff disagrees with the ALJ's decision to focus primarily on the plaintiff's higher GAF score of 55-60, while choosing to ignore the subsequent lower GAF scores that ranged from 30-42.

While it is true that the ALJ provided a numerical value for only the plaintiff's highest GAF scores in his written decision, the ALJ also discussed the plaintiff's "low GAF scores" and explained why he afforded more weight to the higher GAF scores. (Tr. 24.) The ALJ correctly acknowledged the position of the Court of Appeals for the Sixth Circuit that, although GAF scores can be helpful in assessing an individual's mental RFC, GAF scores are not dispositive in determining an

-24-

individual's mental RFC.[29] *Kornecky v.Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 503 n.7 (6th Cir.

Feb. 9, 2006) (quoting DSM-IV-TR 34 (4th ed. 2000)).  *See also Kennedy v. Astrue*, 247 Fed. Appx.

761, 766 (6th Cir. Sept. 7, 2007); *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. Appx. 411, 415 (6th

Cir. Dec. 15, 2006).  Additionally, the Social Security Administration has cautioned: "[The GAF

scale] does not have a direct correlation to the severity requirements in our mental disorder listings."

Revised Medical Criteria for Evaluating Mental Disorders, 65 Fed. Reg. 50,476, 50,764-65

(Aug. 21, 2000.)  Thus, an ALJ's RFC analysis should not be considered any less reliable simply

because the ALJ did not refer to a GAF score. *Kornecky*, 167 Fed. Appx. at 511 (citing *Howard v.

Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)).  *See also Smith v. Astrue*, 565 F. Supp. 2d

918, 924-25 (M.D. Tenn. 2008) (Wiseman, J.).

     The ALJ also referred to evidence in the record to support his position that the plaintiff's

GAF score of 55-60 was more accurate than were the plaintiff's GAF scores ranging from 30 to 42.

(Tr. 24.) The ALJ explained that while at Centerstone, the plaintiff displayed a history of

noncompliant behavior toward prescribed treatment and continually missed appointments, and the

---

[29] As explained in *Kornecky*,

> GAF is a clinician's subjective rating, on a scale of zero to 100, of an
> individual's overall psychological functioning. At the low end, GAF
> 1-10 indicates "[p]ersistent danger of severely hurting self or others
> (e.g., recurrent violence) or persistent inability to maintain personal
> hygiene or serious suicidal act with clear expectation of death."  At
> the high end, GAF 91-100 indicates "[s]uperior functioning in a wide
> range of activities, life's problems never seem to get out of hand, is
> sought out by others because of his or her many positive qualities. No
> symptoms."  A GAF score may help an ALJ assess mental RFC, but
> it is not raw medical data.  Rather it allows a mental health
> professional to turn medical signs and symptoms into a general
> assessment, understandable by a lay person, of an individual's mental
> functioning.

167 Fed. Appx. at 503 n.7 (quoting DSMV-IV-TR at 34) (internal citations omitted).

ALJ attributed the plaintiff's low GAF scores to this inconsistent behavior. (Tr. 24, 224, 228-30, 233, 242-44, 250-52, 257.) Given the record as a whole, the ALJ concluded that although the plaintiff would have some moderate mental limitations even if she were medically compliant, those limitations would not minimize the plaintiff's ability to perform in a "satisfactory manner." (Tr. 24.) The plaintiff's GAF scores were only one of the many factors analyzed by the ALJ in determining the plaintiff's mental RFC.

### 2. The ALJ properly considered Dr. VanVeen's and Dr. Jahan's opinions

The plaintiff also faults the ALJ for failing to provide any reasoning for rejecting the medical opinions of treating psychiatrists Dr. Van Veen and Dr. Jahan. The Social Security Administration follows a "treating source" rule. *See generally Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998). Social Security regulations require the ALJ to "give good reasons" for disregarding the medical opinion of a treating physician.[30] 20 C.F.R. § 404.1527(d)(2). If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[31] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004). However, the Sixth Circuit has clarified its holding in *Wilson* by explaining that the good reason requirement of 20 C.F.R. § 404.1527(d)(2)

---

[30] Medical opinions are defined by 20 C.F.R. §§ 404.1527(a) and 416.927(a) as opinions about the nature and severity of an individual's impairment(s) and they are the only opinions that may be entitled to controlling weight. *Atherton v. Astrue*, 2008 WL 4891185, at *10 (M.D. Tenn. Nov. 12, 2008) (Nixon, J.) (citing Soc. Sec. Rul. 96-2p, 1996 WL 374188 at *2). Such opinions must be "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques and "not inconsistent" with the other "substantial evidence" in the individual's case record. *Id.*

[31] The rationale for the "good reason" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in their case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

-26-

is only applicable to the opinions of treating sources and not to the opinions of other medical sources. *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("Yet even if the purpose of the reasons-giving requirement in 20 C.F.R. § 404.1527(d)(2) applies to the entire regulation, the SSA requires ALJs to give reasons for only *treating* sources.") (emphasis in original).

As noted in *Smith*, classifying medical sources requires courts to analyze and apply the definitions in 20 C.F.R. § 404.1502. 482 F.3d at 876 (citing *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 1989)). According to 20 C.F.R. § 404.1502, there are three different medical sources that may provide evidence: nonexamining sources, nontreating sources, and treating sources. A nonexamining source is "a physician, psychologist, or other acceptable medical source who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. § 404.1502. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but who does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* Furthermore, the regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides . . . or has provided . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* The regulations characterize "an ongoing treatment relationship" as a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

The flaw in the plaintiff's argument is that the plaintiff incorrectly characterizes Dr. Jahan as a treating psychiatrist. According to MTMHI medical forms, Dr. Jahan examined the plaintiff

on December 2, 2004, upon her admission to MTMHI, and again on December 6, 2004, when she was discharged from MTMHI. (Tr. 155-62.)  There is no record evidence that Dr. Jahan examined the plaintiff on any other occasion.  Dr. Jahan's two examinations over the course of a five day period do not constitute an "ongoing medical treatment relationship" since two visits in five days fail to establish the requisite frequency or longevity. *See Smith*, 482 F.3d at 876 (a doctor who examined a plaintiff, completed a medical report, prescribed and refilled medication, and denied medication when the plaintiff returned seeking more, did not demonstrate an ongoing treatment relationship as set forth in the regulation).  Thus, Dr. Jahan is a nontreating source under  20 C.F.R. § 404.1502.

The plaintiff also mischaracterizes Dr. VanVeen as a treating physician.  Upon discharge from MTMHI, the plaintiff began outpatient treatment at Centerstone on December 13, 2004. (Tr. 281.)  Dr. Van Veen's sole evaluation of the plaintiff occurred on January 10, 2005, at which time he prescribed Cymbalta for the plaintiff. (Tr. 253.)  The evidence in the record indicates that the plaintiff had three additional appointments scheduled with Dr. Van Veen, but the plaintiff did not show up for any of them. (Tr. 230, 250, 257.)  The entire treatment relationship between the plaintiff and Dr. Van Veen consisted of a single examination, a Cymbalta prescription, and several missed appointments. (Tr. 230, 250, 253, 257.)  A single examination of a patient by a doctor does not provide the requisite linear frequency to establish an "ongoing medical treatment relationship." *Smith*, 482 F.3d at 876; *Abney v. Astrue*, 2008 WL 2074011, at *11 (E.D. Ky. May 13, 2008) (a psychiatrist who met with the plaintiff one time and signed a psychological assessment of that visit was not a treating physician because one meeting "clearly cannot constitute the 'ongoing treatment relationship'" described in 20 C.F.R. § 404.1502).  Given the lack of an "ongoing medical treatment

relationship" between Dr. Van Veen and the plaintiff, Dr. Van Veen is also a nontreating source under 20 C.F.R. § 404.1502.

Since Dr. Jahan or Dr. VanVeen are both nontreating physicians, the ALJ is not required by *Wilson* and 20 C.F.R. § 404.1502 to explicitly articulate "good reasons" for discounting their medical treatment notes or reports. 378 F.3d at 544-45.

The ALJ also afforded the proper weight to the opinion of DDS physician Dr. George T. Davis, Ph.D. Dr. Davis reviewed the plaintiff's medical history on March 7, 2005, and completed a PRTF and mental RFC on the plaintiff. (Tr. 172- 89.) Given that there was not a treating source medical opinion in the record during the alleged period of disability, the regulations require the ALJ to explain the weight given the State agency physician. *See* 20 C.F.R. § 404.1527(f)(2)(ii) ("Unless the treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist . . . ."); SSR 96-6p, 1996 WL 374180, at *1 (ALJ cannot ignore the findings of fact by State agency medical and psychological consultants and must explain the weight given to such opinions in their decisions). The ALJ determined that the opinions of the State agency consultants were "valid in that they are well supported by the evidence as a whole and consistent with the other substantial evidence in the record." (Tr. 25.) By comparing the opinions of the State agency consultants with other evidence in the record, the ALJ fully complied with 20 C.F.R. § 404.1527(f)(2)(ii) and SSR 96-6P.

The plaintiff's remaining assertion of error that the ALJ failed to properly question the VE about whether the jobs identified were consistent with the DOT is not analyzed separately here in light of the Court's finding that the record contains substantial evidence to support the ALJ's

determination that the plaintiff could perform past relevant work at step four of the evaluation process. (Tr. 25.) If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 393 n.1 (6th Cir. 2008) (if substantial evidence supports a finding that plaintiff is able to perform past relevant work, then the plaintiff's claim is resolved at step four of the sequential review process). *See generally Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

## IV. RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 17) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge

-30-